

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 15, 2020**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 18-44165-ELM |
| BRADLEY PARK AXLINE and | § | |
| MEREDITH AXLINE, | § | Chapter 13 |
| | § | |
| Debtors. | § | |

## MEMORANDUM OPINION

Before the Court for determination is confirmation of the *Amended 2/26/2019 Debtors' Chapter 13 Plan* [Docket No. 54] (the "**Plan**")[1] filed by Bradley Park Axline ("**Dr. Axline**") and Meredith Axline ("**Mrs. Axline**" and together with Dr. Axline, the "**Debtors**"), the chapter 13 debtors in this case. Pam Bassel (the "**Trustee**"), the appointed chapter 13 trustee, has objected to confirmation of the Plan.[2] While the Objection filed by the Trustee asserts several different grounds for denial of confirmation, the sole unresolved objection centers on whether the Plan

---

[1] Debtors' Exh. 4.

[2] The Trustee filed her most recent amended objection to confirmation on March 4, 2019. *See* Docket No. 57 (the "**Objection**"). The Objection incorporates by reference the Trustee's previously filed objection, which in turn incorporates by reference yet another previously filed objection, and so forth. Consequently, the Objection effectively incorporates by reference all of the previously filed objections at Docket Nos. 27, 33, 39 and 53.

satisfies the "disposable income test" of section 1325(b)(1)(B) of the Bankruptcy Code.[3] All other objections to confirmation of the Plan have been resolved or withdrawn.[4]

On July 31, 2019, the parties filed a joint stipulation of relevant facts in relation to the dispute (the "**Stipulations**").[5] On August 1, 2019, the Court conducted an evidentiary hearing.[6] Thereafter, the parties filed their respective post-trial briefs.[7] Having now considered the Plan, the Objection, the Stipulations, the evidence presented, the arguments of counsel, and the parties' respective post-trial briefing, the Court issues its findings and conclusions pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rules of Bankruptcy Procedure 3015(f), 7052 and 9014(c).[8]

## *JURISDICTION*

The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc (Miscellaneous Rule No. 33)* of the United States District Court for the Northern District of Texas. Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding is core in nature under 28 U.S.C. § 157(b)(2)(L).

---

[3] *See* 11 U.S.C. § 1325(b)(1)(B); Stipulations (as hereinafter defined), ¶¶ 45-55. While certain factual matters having relevance to various confirmation requirements of section 1325(a) of the Bankruptcy Code are identified as "disputed" within the Stipulations, *see* Stipulations, ¶¶ 56-57 and 62-63, the Trustee has not objected to confirmation on the basis of any of these section 1325(a) grounds.

[4] *See* Stipulations, ¶ 18.

[5] *See* Docket No. 72.

[6] *See* Docket No. 77 (transcript of hearing).

[7] *See* Docket Nos. 75 and 76.

[8] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

### *FACTUAL BACKGROUND*

The Debtors both work within the medical field.  Dr. Axline is a board-certified OB/GYN. Mrs. Axline is a registered nurse.

In or about 2013, Dr. Axline started his own medical practice after having lost a significant amount of money in Forest Park Medical Center, a medical center with which he was previously affiliated.  The transition proved to be financially difficult.  Not only did Dr. Axline run through most of his personal savings in pursuing the ramp up of the new medical practice, but he also faced tax problems.  In this regard, Dr. Axline had failed to pay all required federal income taxes going back to 2011, and in connection with the new practice he also failed to make required tax payments on account of direct cash-pay procedures that he had performed outside of the umbrella of his practice management company Unified Physician Management.[9]

Ultimately, the tax problems caught up with the Debtors and on or about October 18, 2018, the IRS filed a tax lien against the Axline's home at 2902 River Bend Trail in Flower Mound, Denton County, Texas (the "**Axline Home**") for unpaid 2015 and 2016 federal income taxes of $70,130.75.[10]  Facing the loss of their home, the Debtors filed their joint voluntary petition for relief under chapter 13 of the Bankruptcy Code on October 24, 2018.

### A.    *The Prepetition Mortgage and Vehicle Leases*

In 2014, Dr. Axline[11] acquired the Axline Home with financing provided by First United Bank & Trust Company ("**First United**").  First United holds a first priority mortgage lien in the property to secure the loan.[12]  The Debtors have scheduled the property as having a value of

---

[9] *See* Debtors' Exh. 8 (copy of IRS proof of claim).

[10] *See id.*, at p.5 (attached copy of tax lien); Stipulations, ¶ 19.

[11] Dr. Axline individually acquired the Axline Home prior to his marriage to Meredith Axline.

[12] *See* Stipulations, ¶¶ 12 and 15; Debtor's Exh. 5 (copy of First United proof of claim).

approximately $710,000.00.[13]   The monthly mortgage payment required to be made on the First United loan is $5,499.00, which includes escrowed amounts for taxes and insurance.[14]

In late 2016, Dr. Axline entered into an agreement with Park Place Lexus ("**Park Place**") for the lease of a new 2017 Lexus RX 350 (the "**2017 Lexus**").[15]   The 2017 Lexus is used by Mrs. Axline.   At the time of entering into the 2017 Lexus lease, the Debtors were not planning to seek, nor did they anticipate the need for, bankruptcy relief.   The 2017 Lexus lease provides for monthly lease payments of $934.21 through January 2021.[16]   Upon expiration of the lease on January 12, 2021, Dr. Axline will have the option to purchase the 2017 Lexus for $30,210.95.[17]

Separately, on September 10, 2018, Dr. Axline entered into an agreement with Park Place for the lease of a new 2018 Lexus GX 460 (the "**2018 Lexus**").[18]   The 2018 Lexus is used by Dr. Axline.   The 2018 Lexus lease provides for monthly lease payments of $1,129.82 through September 2022.[19]   Upon expiration of the lease on September 9, 2022, Dr. Axline will have the option to purchase the 2018 Lexus for $27,179.16.[20]   While Dr. Axline was contemplating the possible need for bankruptcy relief at the time of entering into the lease, Dr. Axline believed that the lease of this new, luxury vehicle was justified because his existing car lease was about to expire and monthly payments under the new lease are slightly lower than the lease payments that he was making under the old lease.

---

[13] *See* Debtor's Exh. 1 (Schedule A/B, Response 1.1).

[14] *See* Stipulations, ¶ 17.

[15] *See* Debtors' Exh. 7 (copy of proof of claim related to 2017 Lexus lease, including attached copy of lease).

[16] *See id.*; Stipulations, ¶ 39.

[17] *See* Debtors' Exh. 7 (attached copy of lease); Stipulations, ¶ 38.

[18] *See* Debtors' Exh. 6 (copy of proof of claim related to 2018 Lexus lease, including attached copy of lease).

[19] *See id.*; Stipulations, ¶ 34.

[20] *See* Debtors' Exh. 6 (attached copy of lease); Stipulations, ¶ 33.

**B.** *The Debtors' Disclosed Monthly Income, Expenses and Disposable Income*

Following their bankruptcy filing, the Debtors filed their Schedules I and J,[21] their Official Form 122C-1 Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period ("**Form 122C-1**"),[22] and their Official Form 122C-2 Chapter 13 Calculation of Disposable Income ("**Form 122C-2**")[23] to disclose, among other things, income and expense figures applicable to determining plan contribution requirements.

Pursuant to Schedules I and J, as amended, the Debtors have disclosed that they receive monthly income of roughly $18,356.80 and have monthly expenses of roughly $16,328.42 (which include the Debtors' mortgage payment and Lexus vehicle lease payments), for monthly net income of approximately $2,028.38 ("**Monthly Net Income**").[24] Pursuant to Form 122C-1, the Debtors have disclosed that their annualized current monthly income is greater than the median family income of a household of the same or lesser size in Texas, making them "above-median-income" debtors for purposes of calculating the amount of their disposable income for chapter 13 plan purposes.[25] They have further disclosed that the plan commitment period applicable to them is 5 years, or 60 months.[26] Finally, using Form 122C-2, the Debtors have calculated that they have no monthly disposable income that they are required to contribute to their chapter 13 plan.[27]

---

[21] Debtors' Exh. 2.

[22] *See* Docket No. 20, at pp.1-3.

[23] Debtors' Exh. 3.

[24] *See* Debtors' Exh. 2, at p.6; Stipulations, ¶¶ 43-44.

[25] *See* Debtors' Form 122C-1 (lines 15b, 16c and 17b).

[26] *See id.* (line 21).

[27] *See* Debtors' Exh. 3 (line 45).

**C.**     ***Claims Asserted in the Case by First United and Toyota Lease Trust***

Inasmuch as the dispute in this case centers on how the Debtors have treated payments to be made in relation to the Axline Home and the two leased Lexus vehicles in calculating their disposable income, the proofs of claim filed by First United and Toyota Lease Trust are also considered.

First, in relation to the Axline Home, First United has asserted a fully secured claim in the amount of $453,278.30.[28]  As evidenced by the executed promissory note attached to First United's proof of claim, Dr. Axline is obligated to make monthly principal and interest payments of $3,504.39.[29]  As evidenced by the executed deed of trust attached to the proof of claim, Dr. Axline is also obligated to make monthly escrow payments for ad valorem taxes and property insurance if required by First United (which First United has required), and all principal and interest and escrow payment obligations, along with all other amounts that may be owed to First United, are secured by a deed of trust lien in the Axline Home.[30]  Finally, as evidenced by First United's completed Official Form 410A attached to the proof of claim, the monthly amount owed for principal and interest and the escrow for taxes and insurance is $5,499.00.[31]

Next, with respect to the 2017 Lexus, Toyota Lease Trust, as transferee of the vehicle and assignee of the 2017 Lexus lease,[32] has asserted a claim for $24,289.46.[33]  While the claim is asserted as a secured claim, Toyota Lease Trust describes the purported collateral for the claim as

---

[28] *See* Stipulations, ¶ 16; Debtor's Exh. 5.

[29] *See* Debtors' Exh. 5 (attached Consumer Promissory Note – Adjustable Rate, at p.2).

[30] *See id.* (attached Deed of Trust, Assignment of Rents and Security Agreement, at pp. 1-4).

[31] *See id*. (attached Official Form 410A).

[32] *See* Debtors' Exh. 7 (last page – Texas Certificate of Title reflecting the current owner of the 2017 Lexus as Toyota Lease Trust and the previous owner as Park Place).

[33] *See id.*, at pp.1-2.

"LEASE" in reference to the 2017 Lexus,[34] identifies the claim as being based upon a lease,[35] and reflects its calculation of the amount of the claim as the total of all remaining lease payments under the lease.[36] Moreover, the Texas Certificate of Title attached to the proof of claim identifies Toyota Lease Trust as the owner of the vehicle with no liens.[37]

Finally, with respect to the 2018 Lexus, Toyota Lease Trust, as transferee of the vehicle and assignee of the 2018 Lexus lease,[38] has asserted a claim for $51,971.72.[39] Similar to the 2017 Lexus claim, while the 2018 Lexus claim is asserted as a secured claim, Toyota Lease Trust describes the purported collateral for the claim as "LEASE" in reference to the 2018 Lexus,[40] identifies the claim as being based upon a lease,[41] and reflects its calculation of the amount of the claim as the total of all remaining lease payments under the lease.[42] Moreover, the Texas Certificate of Title attached to the proof of claim identifies Toyota Lease Trust as the owner of the vehicle with no liens.[43]

---

[34] *See id.*, at p.2 (line 9).

[35] *See id.*, at p.2 (line 10).

[36] *See id.*, Exh. A.

[37] *See id.* (last page).

[38] *See* Debtors' Exh. 6 (last page – Texas Certificate of Title reflecting the current owner of the 2018 Lexus as Toyota Lease Trust and the previous owner as Park Place).

[39] *See id.*, at pp.1-2.

[40] *See id.*, at p.2 (line 9).

[41] *See id.*, at p.2 (line 10).

[42] *See id.*, Exh. A.

[43] *See id.* (last page).

D. *The Debtors' Proposed Plan*

In November 2018, the Debtors filed the first iteration of their proposed chapter 13 plan and commenced making plan payments.[44] Thereafter the Debtors amended their plan and on February 26, 2019, filed their currently proposed version of the Plan.

Based upon their Monthly Net Income, the Debtors propose to make payments to the Trustee under the Plan of $2,000.00 per month for the initial 3 months of the Plan, followed by $2,565.00 in month 4, and then $2,000.00 per month in months 5 through 60, for a total of $120,565.00 (the "**Base Amount**") over 60 months.[45] In relation to First United, which is listed in one of the secured creditor provisions of the Plan, the Debtors propose to make their monthly $5,499.00 mortgage payments directly to First United (*i.e.* separate from the previously mentioned payments to be made to the Trustee).[46] In relation to Toyota Lease Trust, the Debtors reference the Lexus leases as unexpired leases to be assumed under the Plan with no cure amounts owed on account of any existing defaults.[47] Thus, the Debtors intend to directly make lease payments to Toyota Lease Trust as they come due.[48]

Finally, in the case of unsecured creditors, the Plan discloses that, for purposes of the "disposable income test" of section 1325(b)(1)(B) of the Bankruptcy Code, the Debtors' projected monthly disposable income, as determined pursuant to section 1325(b)(2) of the Bankruptcy Code, is $0.00 (based upon the Debtors' calculation from Form 122C-2), resulting in a required Unsecured Creditors' Pool over the life of the Plan (the "**UCP**") of $0.00. Even so, the Plan

---

[44] *See* Docket No. 21; Stipulations, ¶ 9.

[45] *See* Plan, § I.A.

[46] *See id.*, § I.G.

[47] *See id.*, § I.K.

[48] *See* Debtors' Exh. 2, at p.5 (Schedule J, lines 17a. and 17b.).

estimates a total payout of approximately 5%, or roughly $11,374.00, on scheduled non-priority unsecured claims of $227,480.45,[49] given the Base Amount of the payments to be made to the Trustee under the Plan.[50]

## DISCUSSION

### A.    Overview of the Parties' Arguments

The Trustee objects to confirmation of the Plan on the basis of the Plan's alleged failure to satisfy the disposable income test of section 1325(b)(1)(B) of the Bankruptcy Code.  The Trustee bases her objection on the assertion that the Debtors have erroneously calculated the amount of their monthly disposable income under the provisions of section 1325(b)(2) of the Bankruptcy Code by impermissibly deducting from their monthly income mortgage and vehicle lease expenses in excess of the IRS Local Standard expense allowance levels[51] provided for under the "means test" provisions of section 707(b)(2)(A)(ii)(I) of the Bankruptcy Code (which, as explained below, are applicable to the determination of an above-median-income debtor's disposable income).

In making this assertion, the Trustee requests the Court's adoption of what she refers to as a "capped variable allowance approach" to the interpretation of section 707(b)(2)(A) of the Bankruptcy Code.  Under this approach, the Trustee argues that with respect to both mortgage and vehicle lease payments, irrespective of the character of the payments and the clause of section 707(b)(2)(A) under which such expenditures are to be deducted from monthly income, only the *lesser* of (a) the amount of the mortgage and vehicle lease allowances provided for in the IRS Local Standards incorporated by section 707(b)(2)(A)(ii)(I) (which serve as the "cap" under the

---

[49] Total unsecured claims filed in the case total $222,592.61.  *See* Stipulations, ¶ 22.

[50] *See* Plan, § I.J.

[51] The parties have stipulated that the applicable IRS Local Standard monthly mortgage allowance is $1,346.00, and that the applicable IRS Local Standard monthly vehicle ownership or lease allowance is $497.00 per vehicle.  *See* Stipulations, ¶¶ 23 and 40.

Trustee's approach) and (b) the debtor's *actual* mortgage and vehicle lease payments (which serve as the "variable" limitation under the Trustee's approach)[52] may be deducted from a debtor's monthly income in calculating monthly disposable income.  According to the Trustee, capping the Debtors' mortgage and vehicle lease expenses at the applicable IRS Local Standard expense allowance levels results in the Debtors having monthly disposable income of $5,320.52, thereby requiring the Plan to provide for a UCP of at least $319,231.20.[53]  Thus, because the Plan fails to provide for a UCP of at least this amount, the Trustee asserts that confirmation of the Plan must be denied.

---

[52] With respect to the "variable" component of the Trustee's approach, the Trustee asserts that the limitation of a deductible expense to the *lesser* of the applicable IRS Standard allowance amount or the debtor's actual payment obligation is supported by, among other decisions, the Supreme Court's decisions in *Hamilton v. Lanning*, 560 U.S. 505 (2010) and *Ransom v. FIA Card Servs., N.A*., 562 U.S. 61 (2011).

    In *Lanning*, the Supreme Court was presented with the question of whether a debtor's projected disposable income should be calculated on a purely mechanical basis, whereby a debtor's current monthly income is multiplied by the applicable commitment period of the plan without any adjustment, or instead on a forward-looking basis that starts with the mechanical calculation but then takes into consideration material changes in income and/or expenses that are virtually certain to occur during the commitment period.  *See Lanning*, 560 U.S. at 509-13.  The Supreme Court adopted the forwarding looking approach, holding that "when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."  *Id*. at 525.

    In *Ransom*, the Supreme Court was presented with the question of the "applicability" of an IRS Standard expense allowance (discussed *infra*) to a debtor that does not have any expenses falling within the category of such allowance.  *See Ransom*, 562 U.S. at 64.  Finding that the IRS Standard expense allowance was not applicable under such circumstances, the Court explained that the debtor's "reading of 'applicable' would sever the connection between the means test and the statutory provision it is meant to implement – the authorization of an allowance for (but only for) 'reasonably necessary' expenses.  Expenses that are wholly fictional are not easily thought of as reasonably necessary."  *Id*. at 74.

    Thus, based upon the foregoing Supreme Court authority, the Trustee argues that treatment of an applicable IRS Standard as granting a *fixed* expense allowance irrespective of the debtor's actual payment obligations would both endorse a mechanical approach to the determination of monthly disposable income instead of a forward-looking approach, as required by the Supreme Court in *Lanning*, and would enable a debtor to deduct fictional expenses in contravention of the Supreme Court's reasoning in *Ransom*.  At least one other judge within this District has disagreed with the Trustee's reasoning in allowing the full amount of an expense allowance under an applicable IRS Standard despite having lower actual expenses.  *See In re Everhart*, 607 B.R. 565 (Bankr. N.D. Tex. 2019); *In re Anderson*, 604 B.R. 717 (Bankr. N.D. Tex. 2019).  Ultimately, however, it is unnecessary for the above-signed judge to weigh in on the matter because, in the case at bar, the Debtors' monthly mortgage and vehicle lease expenses *exceed* the amount of the associated IRS Local Standard allowance amounts.

[53] *See* Trustee's Exh. 5.  The revised calculation also incorporates a minor adjustment to the Debtors' current monthly income to include royalty income of $120.00 per month that was not included in the Debtors' Form 122C-1.

The Debtors, having the ultimate burden of proof on all elements of confirmation of the Plan under section 1325 of the Bankruptcy Code, including compliance with the disposable income test of section 1325(b)(1)(B) in the face of an objection,[54] make two counter-arguments – both focused on the "capped" aspect of the Trustee's proposed approach. First, the Debtors assert that the Trustee fails to give effect to the secured debt expense deduction provisions of section 707(b)(2)(A)(iii) of the Bankruptcy Code, which are separate from the expense deduction provisions of section 707(b)(2)(A)(ii) of the Bankruptcy Code in which the IRS Standards are referenced. Second, asserting that the applicable IRS Standards incorporated by section 707(b)(2)(A)(ii)(I) of the Bankruptcy Code neither serve as a limitation to, nor as definitive guidance with respect to the reasonable necessity of, a debtor's expenses, but rather solely provide expense *allowances* designed to guarantee minimum baseline expense deductions to the debtor, the Debtors assert that where a debtor's actual expenses are higher than the associated IRS Standards, the debtor's actual expenses are fully deductible.

For reasons discussed below, both the Trustee and the Debtors misinterpret and misapply the means test provisions of section 707(b)(2) in calculating the Debtors' monthly disposable income.

**B.      The "Disposable Income Test" of Section 1325(b)(1)(B)**

"The task of resolving the dispute over the meaning of [any provision of the Bankruptcy Code] begins where all such inquiries must begin: with the language of the statute itself."[55] Section 1325 of the Bankruptcy Code sets out the requirements for confirmation of a chapter 13 plan.[56] Section 1325(b)(1) provides as follows:

---

[54] *See In re Williams*, 354 B.R. 604, 608 (Bankr. N.D.N.Y. 2006).

[55] *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

[56] *See* 11 U.S.C. § 1325.

If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. § 1325(b)(1). Thus, for a chapter 13 plan that will provide for less than a full recovery to unsecured creditors on account of their allowed unsecured claims, to be confirmed in the face of an objection by the chapter 13 trustee or the holder of an allowed unsecured claim, section 1325(b)(1) requires the plan to provide for the commitment of all disposable income projected to be received by the debtor during the commitment period of the plan towards the payment of unsecured creditors. This is commonly referred to as the "disposable income test."

For purposes of determining whether a plan complies with the disposable income test, section 1325(b)(2) defines "disposable income" as follows:

For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID-19),[57] child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended –

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization

---

[57] This first exclusion of income was added by the Coronavirus Aid, Relief, and Economic Security Act of March 27, 2020, which was made immediately applicable to all pending bankruptcy cases upon enactment, but which will sunset on the date that is one year after the date of enactment. *See* Pub. L. No. 116-136, § 1113 (Mar. 27, 2020).

(as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2). While at first blush the above definition may seem relatively straight forward, in application it can be quite complex. Among other things, whether the amount of income spent by a debtor "for the maintenance or support of the debtor or a dependent of the debtor" is "reasonably necessary" is seemingly dependent upon a whole host of case specific factors. To establish some level of uniformity, however,[58] at least in the case of above-median-income debtors, Congress added the following directive within section 1325(b)(3) of the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005:

Amounts reasonably necessary to be expended under paragraph (2), other than subparagraph (A)(ii) of paragraph (2) [related to charitable contributions], shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)….

11 U.S.C. § 1325(b)(3).

### 1. Incorporated "Means Test" Expense Allowance Provisions

Section 707(b)(2) of the Bankruptcy Code, in turn, sets out the income and expense test commonly referred to as the "means test" for determining whether a debtor's pursuit of relief under chapter 7 of the Bankruptcy Code is presumptively abusive.[59] Specifically, section 707(b)(2)(A)(i) provides:

In considering … whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly

---

[58] *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 65 (2011) (explaining that the prior practice of calculating a debtor's reasonably necessary expenses on a case-by-case basis led to "varying and often inconsistent determinations").

[59] *See* 11 U.S.C. § 707(b)(2); *see also id*. § 707(b)(1) (providing that a chapter 7 case may be dismissed upon a finding of abuse).

income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 [*i.e.* the equivalent of a 5-year chapter 13 plan] is not less than the lesser of –

(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,700,[60] whichever is greater, or

(II) $12,850.[61]

11 U.S.C. § 707(b)(2)(A)(i).

Where the calculation results in a presumption of abuse, section 707(b)(2)(B) of the Bankruptcy Code provides that the presumption may only be rebutted by demonstrating that "special circumstances" exist, such as a serious medical condition or a call or order to active duty in the Armed Forces, justifying additional expenses or an adjustment to monthly income for which there is no reasonable alternative and (1) the additional expenses or adjustments are itemized, documented and verified under oath, (2) their necessity and reasonableness are explained in detail, and (3) when incorporated into the means test calculation of section 707(b)(2)(A)(i), the calculation no longer results in a presumption of abuse. *See* 11 U.S.C. § 707(b)(2)(B).

"Congress adopted the means test … to help ensure that debtors who *can* pay creditors *do* pay them."[62] Thus, in the chapter 13 context, section 1325(b)(3)'s cross-reference to subparagraphs (A) and (B) of section 707(b)(2) in an above-median-income case for the purpose of determining whether the debtor's monthly expenditures are reasonably necessary and, thus, may be deducted from the debtor's monthly income in calculating monthly disposable income is effectively designed to ensure that the same type of abuse that would warrant dismissal of a chapter

---

[60] Effective April 1, 2019, the amount increased to $8,175.00; however, the increased amount only applies to cases filed on or after the effective date of the increase.

[61] Effective April 1, 2019, the amount increased to $13,650.00; however, the increased amount only applies to cases filed on or after the effective date of the increase.

[62] *Ransom*, 562 U.S. at 64 (emphasis in orig.).

7 case is not present in the chapter 13 case by virtue of the debtor's proposal of a chapter 13 plan that fails to commit all disposable income during the plan commitment period towards the payment of unsecured creditors who will not otherwise receive payment in full of their allowed unsecured claims.

With the foregoing in mind, in determining the reasonable necessity of an above-median-income debtor's monthly expenses, subparagraph (A) of section 707(b)(2) permits the following categories of monthly expenses to be deducted from monthly income:

(1)　　Living Expenses (§ 707(b)(2)(A)(ii)).　In the case of monthly living expenses, section 707(b)(2)(A)(ii) ("**Clause (ii)**") provides for the deduction of the following standardized IRS expense allowance amounts, along with other actual expenses falling within IRS expense guidelines or as otherwise provided within Clause (ii), provided, however, that "[n]otwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts":[63]

      (a)　　Standardized IRS Expense Allowance Amounts.　First, subclause (I) provides that the debtor's monthly expenses shall include "the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards … issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent."[64]

      (b)　　Other Actual and Necessary Expenses Within IRS Guidelines.　Second, subclause (I) provides that the debtor's monthly expenses shall include "the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent."[65]

      (c)　　Other Actual and Necessary Expenses.　Third, specific reference is made in subclauses (I) – (V) to the following types of actual expenses that may be deducted:

---

[63] 11 U.S.C. § 707(b)(2)(A)(ii)(I).

[64] *Id.*

[65] *Id.*

- <u>Health and Disability Insurance, Family Safety, and Supplemental Food and Clothing</u>. Subclause (I) provides that a debtor's monthly expenses may include, if applicable, actual expenses for reasonably necessary health insurance, disability insurance, and health savings account expenses; reasonably necessary expenses incurred to maintain the safety of the debtor and the family of the debtor from family violence; and any reasonably necessary additional allowance for food and clothing of up to 5% of the food and clothing categories as specified by the IRS National Standards.[66]

- <u>Care of Household or Family Members</u>. Subclause (II) provides that the debtor's monthly expenses may include, if applicable, the continuation of actual expenses paid by the debtor that are reasonable and necessary for the care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family who is unable to pay for such reasonable and necessary expenses.[67]

- <u>Chapter 13 Administrative Costs</u>. Subclause (III) provides that the debtor's monthly expenses may include the actual administrative expenses of administering a chapter 13 plan in the district in which the debtor resides, up to an amount of 10% of the projected plan payments, as determined under schedules issued by the Executive Office for United States Trustees.[68]

- <u>Educational Expenses for Dependent Minor Children</u>. Subclause (IV) provides that the debtor's monthly expenses may include the actual expenses for each dependent child under the age of 18, not to exceed $1,925[69] per year per child, to attend a private or public elementary or secondary school, subject to documentation and additional explanation with respect to their reasonableness and necessity and why they are not otherwise accounted for within the categories of expenses included within the IRS National or Local Standards or Other Necessary Expenses referred to in subclause (I).[70]

---

[66] *See id.*

[67] *See id.* § 707(b)(2)(A)(ii)(II).

[68] *See id*. § 707(b)(2)(A)(ii)(III).

[69] Effective April 1, 2019, the amount increased to $2,050.00; however, the increased amount only applies to cases filed on or after the effective date of the increase.

[70] *See* 11 U.S.C. § 707(b)(2)(A)(ii)(IV).

- <u>Additional Housing and Utility Expenses</u>. Finally, subclause (V) provides that the debtor's monthly expenses may include actual expenses for home energy costs in excess of the allowance specified in the IRS' Local Standards for housing and utilities, subject to documentation of such actual expenses and the debtor's demonstration of their reasonableness and necessity.[71]

(2) <u>Secured Debt Payments (§ 707(b)(2)(A)(iii))</u>. Second, in the case of deductible secured debt payments, section 707(b)(2)(A)(iii) ("**Clause (iii)**") provides that the "debtor's average monthly payments on account of secured debts shall be calculated as the sum of – (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; divided by 60."[72]

(3) <u>Priority Debt Payments (§ 707(b)(2)(A)(iv))</u>. Finally, in the case of deductible priority debt payments, section 707(b)(2)(A)(iv) ("**Clause (iv)**") provides that the "debtor's expenses for payment of all priority claims (including priority child support and alimony claims) shall be calculated as the total amount of debts entitled to priority, divided by 60."[73]

### *2.* *The National and Local IRS Expense Standards*

"The National and Local Standards referenced in [Clause (ii)] are tables that the IRS prepares listing standardized expense amounts for basic necessities. The IRS uses the Standards to help calculate taxpayers' ability to pay overdue taxes."[74]

First, the IRS has established National Standards based upon household size for five types of expenses: food, housekeeping supplies, apparel and services, personal care products and services, and miscellaneous. "The standards are derived from the Bureau of Labor Statistics

---

[71] *See id*. § 707(b)(2)(A)(ii)(V).

[72] *Id*. § 707(b)(2)(A)(iii).

[73] *Id*. § 707(b)(2)(A)(iv).

[74] *Ransom*, 562 U.S. at 66 (citations omitted).

Consumer Expenditure Survey. The survey collects information from the Nation's households and families on buying habits (expenditures), income and household characteristics."[75]

Second, the IRS has established Local Standards with respect to two broad categories of expenses: (1) Housing and Utilities Expenses; and (2) Transportation Expenses. Housing and Utilities Expense standards, which are also based upon household size, cover expenses for mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, telephone, cell phone, internet and cable. "The housing and utilities standards are derived from the U.S. Census Bureau, American Community Survey and BLS data, and are provided by state down to the county level."[76] For purposes of Form 122C-2, Housing and Utilities Expense standards are further broken down into two subcategories: (a) mortgage or rent expenses; and (b) insurance and operating expenses.

Transportation Expense standards, on the other hand, have been broken down by the IRS into two parts for those who own or lease a vehicle: (a) "ownership costs," which are nationwide figures for monthly loan or lease payments (considered to be part of the Local Standards even though based upon nationwide figures); and (b) monthly operating costs, including for maintenance, repairs, insurance, fuel, registrations, licenses, inspections, parking and tolls, which are "broken down by Census Region and Metropolitan Statistical Area."[77] There are also separate Transportation Expense allowance figures for public transportation for those who do not own or lease a vehicle.

---

[75] *See* discussion of IRS' Collection Financial Standards at https://www.irs.gov/businesses/small-businesses-self-employed/collection-financial-standards.

[76] *See id.*

[77] *See id.*

Separately, the reference to "Other Necessary Expenses" in Clause (ii) is to various other types of expenses that the IRS may allow depending upon the particular facts and circumstances of the taxpayer at issue. Examples include accounting and legal fees, current year taxes, involuntary wage deductions (*e.g.*, work-imposed costs or dues), life insurance, court-ordered payments (*e.g.*, for child or spousal support), education expenses (*e.g.*, if required for employment or for a physically or mentally challenged child where no public education or similar service is available), childcare, and optional telephones and telephone-related services.[78]

## C.      *Consideration of Ransom v. FIA Credit Card Services, N.A.*

Given the Trustee's heavy reliance upon the Supreme Court's decision in *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61 (2011) in arguing for a cap on mortgage and vehicle lease expenses, it is appropriate to provide a brief overview of the opinion.

In *Ransom*, the question presented was whether an above-median-income, car-owner debtor was entitled to claim the ownership cost allowance of the IRS Local Transportation Expense standards in calculating his monthly disposable income despite having no car loan payment obligations.[79] Keying off of the word "applicable" in Clause (ii) of section 707(b)(2)(A), the Supreme Court ruled that the ownership cost allowance was not an "applicable" Local Standard to the debtor because the debtor had no car loan or lease payment obligations.[80] Accordingly, the Court ruled that the debtor was not entitled to the deduction.[81] In making the determination, the Court explained:

---

[78] *See* Internal Revenue Manual, Part 5, Chapter 15, Section 1 (Financial Analysis Handbook), Subsection 11 (Other Expenses), located at https://www.irs.gov/irm/part5/irm_05-015-001#idm140164172127936.

[79] *See Ransom*, 562 U.S. at 64.

[80] *Id*. at 69-72.

[81] *See id*. at 64, 69-70.

"Applicable" means "capable of being applied: having relevance" or "fit, suitable, or right to be applied: appropriate."[82] So an expense amount is "applicable" within the plain meaning of the statute when it is appropriate, relevant, suitable, or fit.

What makes an expense amount "applicable" in this sense (appropriate, relevant, suitable, or fit) is most naturally understood to be its correspondence to an individual debtor's financial circumstances. Rather than authorizing all debtors to take deductions in all listed categories, Congress established a filter: A debtor may claim a deduction from a National or Local Standard table (like "[Car] Ownership Costs") if, but only if, that deduction is appropriate for him. And a deduction is so appropriate only if the debtor has costs corresponding to the category covered by the table – that is, only if the debtor will incur that kind of expense during the life of the plan.

*Ransom*, 562 U.S. at 69-70.

Of particular relevance to the case at bar, one of the debtor's arguments in *Ransom* was that by separately allowing for certain types of expense deductions that are tied to actual expense amounts incurred by a debtor, Congress must have intended the expense allowances of the IRS National and Local Standards – which make no reference to actual expense amounts incurred – to be applicable to all debtors irrespective of whether any actual expenses are incurred.[83] In rejecting the argument, the Supreme Court elaborated as follows:

Although the expense amounts in the Standards apply only if the debtor incurs the relevant expense, the debtor's out-of-pocket cost may well not control the amount of the deduction. If a debtor's actual expenses exceed the amounts listed in the tables, for example, the debtor may claim an allowance only for the specified sum, rather than for his real expenditures. For the Other Necessary Expense categories, by contrast, the debtor may deduct his actual expenses, no matter how high they are. Our reading of the means test thus gives full effect to 'the distinction between "applicable" and "actual" without taking a further step to conclude that "applicable" means "nonexistent."'

*Id*. at 76 (footnotes and citations omitted).

---

[82] Citing Webster's Third New International Dictionary 105 (2002), New Oxford American Dictionary 74 (2nd ed. 2005) and 1 Oxford English Dictionary 575 (2nd ed. 1989).

[83] *See Ransom*, 562 U.S. at 74-75.

**D.    *Secured Debt Payments are Not Capped by the IRS Local Standards***

With the backdrop of the foregoing statutory and case law authority, the initial question presented by the parties in the case before the Court is whether deductible secured debt payments under Clause (iii) are capped in amount by associated IRS Local Standards incorporated by Clause (ii).  For the following reasons, the Court concludes that they are not.[84]

First, the expense deductions provided by Clause (iii) are distinct and separate from the expense deductions provided by Clause (ii).  Starting with the language of the means test calculation, itself, section 707(b)(2)(A)(i) provides that current monthly income is to be reduced by the expense amounts determined under Clauses (ii), (iii) **and** (iv).[85]  By using the conjunctive word "and" in referring to Clauses (ii), (iii) and (iv), Congress evinced its intent for expenditures separately falling within *each* of the three clauses to be deducted from current monthly income.[86]

Second, none of the language within Clause (ii) provides or suggests that Clause (ii) governs or serves as a limit on the provisions of Clause (iii), and none of the language within Clause (iii) provides or suggests that the expenditures permitted under Clause (iii) are in any way governed or limited by the provisions of Clause (ii).  On the other hand, there are certain actual expense provisions of Clause (ii) that expressly require proof of the reasonable necessity of any actual expenses that exceed the IRS Standards.[87]  Had Congress intended the same time of proof for secured debt payments provided for in Clause (iii), then it would have expressly provided for

---

[84] *See also Baud v. Carroll*, 634 F.3d 327, 347-49 (6th Cir. 2011); *Everhart*, 607 B.R. at 574.

[85] *See* 11 U.S.C. § 707(b)(2)(A)(i) (directing the "debtor's currently monthly income [to be] reduced by the amounts determined under clauses (ii), (iii), **and** (iv)" and then multiplied by 60 to arrive at the product to be compared against specified amounts for determination of whether a presumption of abuse exists) (emphasis added).

[86] *See Ransom*, 562 U.S. at 65 ("Under the means test, a debtor calculating his 'reasonably necessary' expenses is directed to claim allowance for defined living expenses [*i.e.* expenses under Clause (ii)], *as well as* for secured [*i.e.* Clause (iii)] and priority [*i.e.* Clause (iv)] debt") (emphasis added).

[87] *See, e.g.*, 11 U.S.C. § 707(b)(2)(A)(ii)(IV)-(V).

the same. "It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.' To do so '"is not a construction of a statute, but, in effect, an enlargement of it by the court."' A textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."[88]

Finally, Clause (ii) includes the "notwithstanding" proviso that monthly expenses allowed under Clause (ii) shall expressly exclude payments for debts.[89] Thus, if Clause (ii) were applicable to secured debt payments allowed under Clause (iii), the debt exclusion proviso of Clause (ii) would render Clause (iii) completely meaningless because no secured debt payments would ever be allowable as part of the debtor's monthly expenses irrespective of the application of the IRS Standards. In construing a statute, however, the Supreme Court has instructed that it is the courts' "duty 'to give effect, if possible, to every clause and word of a statute.'"[90] Thus, only by treating Clause (iii) debt payments as separate from Clause (ii) expense allowances can this be achieved.[91]

---

[88] *Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019) (citations omitted).

[89] *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I) ("Notwithstanding any other provision of this clause, the monthly expenses of the debtor *shall not include any payments for debts*") (emphasis added). Use of the term "debt" here creates a level of uncertainty given the Bankruptcy Code's expansive definitions of "debt" (liability on a claim) and "claim" (any right to payment or to an equitable remedy for breach of performance if such breach gives rise to a right to payment, in each case whether or not the right is, among other things, matured or unmatured). *See* 11 U.S.C. §§ 101(5) and 101(12). For example, applied literally, the "debt" exclusion would ostensibly preclude the deduction of any expense associated with a prepetition agreement (such as a prepetition lease). Read in conjunction with section 1325(b)(2)(A)(i), however, the intent of the proviso appears to be to limit allowable Clause (ii) expenses to obligations "that first become[] payable after the date the petition is filed." *See* 11 U.S.C. § 1325(b)(2)(A)(i). Construed in this way, the "debt" proviso also comports with the overall bankruptcy scheme of having unsecured, nonpriority prepetition debts/claims in a chapter 13 case satisfied only under the terms of a confirmed chapter 13 plan. *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

[90] *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883))).

[91] *See also In re Fields*, 534 B.R. 126, 135-36 (Bankr. E.D.N.C. 2015).

**E.** ***Clause (ii) Expenses are Capped by Applicable IRS Standards***
***In the Absence of Special Circumstances***

The second question presented by the parties' dispute is whether mortgage and vehicle lease expenses that are dependent upon Clause (ii) for allowance are capped at the amount of the applicable IRS Local Standards. Here, for the reasons that follow, the Court concludes that absent proof of "special circumstances" warranting the allowance of expenses in excess of the Local Standards under section 707(b)(2)(B) of the Bankruptcy Code, the Local Standards do serve as a cap on such expenses.[92]

First, section 1325(b)(3) dictates that "amounts reasonably necessary to be expended" for the maintenance or support of an above-median-income debtor or a dependent of such debtor, or for a domestic support obligation, *shall* be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2) of the Bankruptcy Code.[93] In other words, the cross-reference to sections 707(b)(2)(A) and 707(b)(2)(B) is not permissive or advisory in nature – it is mandatory. With this in mind, if the Court were to adopt the Debtors' suggestion that the Court may disregard the IRS Standards referenced in Clause (ii) where a debtor's actual expenses in a particular category covered by the Standards exceed the Standards, such disregard of the Standards would transform section 1325(b)(3) from a mandatory provision into a permissive or discretionary provision.

Second, such a construction would also render impotent the "special circumstances" provisions of section 707(b)(2)(B). Section 707(b)(2)(B) sets out specific requirements for the allowance of expenses in addition to those provided for in section 707(b)(2)(A). Among other things, the debtor must itemize the additional expenses, provide supporting documentation of the additional expenses, provide a detailed explanation of the special circumstances that make the

---

[92] *See also Everhart*, 607 B.R. at 574; *In re Smith*, 549 B.R. 188, 193-94 (Bankr. N.D. Miss. 2016).

[93] *See* 11 U.S.C. § 1325(b)(3) (emphasis added).

additional expenses reasonable and necessary, and verify the accuracy of all such information under oath.[94] These requirements only have relevance if the IRS Standards serve as definitive guidance on reasonably necessary expense levels for those types of Clause (ii) expenses covered by the Standards – thereby serving as a cap on the allowable level of such expenses absent proof of special circumstances warranting the allowance of additional expenses.

## F. *Application of the Foregoing Determinations to the Debtors' Claimed Expenses*

Based upon the foregoing, the first step in analyzing the Debtors' mortgage and vehicle lease expenses is to determine if they are Clause (ii) expenses or Clause (iii) expenses. In the case of the First United mortgage payments, the record is clear, and the parties have stipulated, that the payments constitute mortgage payments secured by a lien in the Axline Home that will become contractually due over the life of the Plan or that (in the case of the tax and insurance escrow) are otherwise required to be made in order for the Debtors to maintain possession of the Axline Home (their primary residence). Accordingly, such payments constitute debt payments covered by Clause (iii) of section 707(b)(2)(A) of the Bankruptcy Code as to which the Local Standards of Clause (ii) of section 707(b)(2)(A) are inapplicable.

In the case of the payments to Toyota Lease Trust, on the other hand, Toyota Lease Trust has muddied the picture to an extent by filing secured proofs of claim in the case for the balance of the lease payments owed on the Lexus vehicles. That said, while a properly filed and supported proof of claim constitutes prima facie evidence of the validity of the claim asserted thereby,[95] here, the Toyota Lease Trust proofs of claim do not constitute prima facie evidence of the secured nature of such claims given that the proofs of claim also clearly identify the claims as being based upon

---

[94] *See* 11 U.S.C. § 707(b)(2)(B)(ii)-(iii).

[95] *See* Fed. R. Bankr. P. 3001(f).

leases and the Certificates of Title attached in support clearly identify Toyota Lease Trust (not either of the Debtors) as the owner of the vehicles.[96]  Moreover, the Debtors themselves have treated the Lexus vehicle leases as unexpired leases subject to assumption under the terms of the Plan.  Accordingly, the Court finds that the payments to be made to Toyota Lease Trust do not constitute secured debts covered by the provisions of Clause (iii) of section 707(b)(2)(A) of the Bankruptcy Code, but rather expenses covered by the provisions of Clause (ii) of section 707(b)(2)(A).

Consequently, it is necessary to next compare the amount of the Debtors' monthly Lexus vehicle lease payments – collectively $2,064.03 – to the applicable IRS Local Standard.  In this regard, the parties have stipulated that the applicable IRS Local Standard provides for a monthly vehicle ownership or lease allowance of $497.00 per vehicle – or $994.00 for two vehicles.[97]  Thus, on a monthly basis, the Debtors' actual Lexus vehicle lease payments exceed the IRS Local Standard for two vehicles by $1,070.03.  As to this excess, the Debtors have neither presented nor established any special circumstances under section 707(b)(2)(B) to warrant the inclusion of some or all of the additional expense to the Debtors' deductible expenses.

### CONCLUSION

In summary, while the Debtors are correct that the IRS National and Local Standards are inapplicable to the determination of the reasonable necessity of monthly payments made on secured debts determined in accordance with the provisions of section 707(b)(2)(A)(iii) of the Bankruptcy Code, the IRS National and Local Standards, as a definitive gauge of reasonableness

---

[96] *See, e.g.,* Tex. Bus. & Com. Code § 9.203(b)(2) (requirement that the debtor have rights in the alleged collateral or the power to transfer rights in such collateral in order for a security interest to attach to the alleged collateral); *see also* Fed. R. Bankr. P. 3001(d) ("If a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected").

[97] *See* Stipulations, ¶ 40.

and necessity for those categories of expenses covered by the Standards under section 707(b)(2)(A)(ii) of the Bankruptcy Code, do have the effect of establishing a limit or cap on such expenses in the absence of special circumstances warranting the allowance of higher expenses in accordance with section 707(b)(2)(B) of the Bankruptcy Code.

Here, while the Debtors' monthly mortgage payments, as expenditures for secured debt, are not limited by the relevant Housing and Utilities Expense amounts set forth within the IRS Local Standards, the Debtors' Lexus vehicle lease payments, which do not constitute expenditures for any secured debt, are limited by the relevant Transportation Expense allowance amount set forth within the IRS Local Standards given the Debtors' failure to establish any special circumstances warranting the allowance of expenses in excess of the allowance amount. Thus, based upon the $1,070.03 in non-deductible monthly vehicle lease expenses, the Debtors will have disposable income of $64,201.80 over the plan commitment period. Because the Debtors' Plan fails to provide for a UCP in at least this amount for the payment of allowed non-priority unsecured claims, confirmation of the Plan will be denied due to the Plan's failure to satisfy the disposable income test of section 1325(b)(1)(B) of the Bankruptcy Code.

### # # #   END OF MEMORANDUM OPINION   # # #